Good morning. May it please the Court? My name is Victoria Chuggin, and I represent the appellant, Beth Nevin. I'd like to reserve two minutes for rebuttal. Ms. Nevin applied for SSI in this case, and that's a program for people with very limited financial means, and these benefits were critical to her. And so when her application was denied, she appealed that, and during the appeal, she filed a new application, and that was granted. That provided a great deal of relief for her. And the only reason she continued to pursue her claim on BAC benefits, the past due benefits available on the first claim, is that she reasonably believed that there was no way that that second application could be reopened and that her benefits could be taken away from her. Internal agency guidance, to the contrary, is my support. I think there's a correction. It could be reopened, assuming the reopening was timely. Yes, yes. By the time her hearing occurred, she felt that she was beyond the two years and that that was safe. The administrative law judge in this case appears to have had some ideas about the case that really permeated the multiple hearings and decisions and that ran counter to the opinions of several medical providers, including two medical experts. And I think there are two points that really I'd like to make today. One is about interstitial lung disease. Interstitial lung disease is very similar to what we've heard of, like asthma and COPD, but it's different in the sense that you don't have positive ventilatory studies. So what that means is you are not short on oxygen. What happens is your carbon dioxide goes up. It affects your brain, and you begin to panic. You feel that you're suffocating. And this is what the medical expert explained in this case, that Ms. Nevin, even though she was able to walk for six minutes and have good oxygen levels, even though her PFT, her pulmonary function tests, the ventilatory part of that were perfectly normal, she was subjectively and objectively suffocating because of the level of CO2 in her blood. Because of that, her anxiety was spiking, and the pattern went around and around. She would become anxious. She couldn't breathe. This is why she went to the emergency room on multiple occasions. The combined effect of these impairments is what led to a finding of disability on her second application as a somatoform disorder. And it's what the medical experts in this case also said. From the physical standpoint, it was that, yes, the interstitial lung disease combined with the back pain limits her to sedentary work. Given her age, she should be found disabled. The psychological examiners said, from the perspective of anxiety, she meets a listing. And because she meets a listing, she's disabled at step three. And even if that were not the case, she would miss too much work, and she would be unable to concentrate. So there are many ways to get to disability in this case. We submit that the rejection of the multiple opinions was the greatest error in this case, because these were doctors who were treating physicians in two cases. There was the... Jeremy Stevens, who was her treating physician, who very clearly said that she was limited to sedentary work and needed to lie down. That opinion was improperly rejected because it was on a checkbox form. But he provided evidence to support his opinion. The administrative law judge also challenged it based on the opinion of another doctor, Dr. Bridget Collins, who performed a very brief test. This is a test where you have an individual walk for six minutes in the doctor's office with a pulse oximeter, the kind that you put on your finger or your ear. And that pulse oximeter showed that the oxygen level was fine, but as I mentioned earlier, that wouldn't have been incompatible with the subjective feeling of suffocation and ILD, or interstitial lung disease. So there was no reason to use... This is a medical question that I'm not sure I'm fully capable of asking properly, and you may be fully capable of answering properly. Well, if the level of oxygen is appropriate, does somehow an elevated level of CO2 interfere with the absorption of oxygen? How can it be that she's in trouble if her oxygen level is proper? My understanding that it's very much like when we hold our breath or swim underwater. When we take in oxygen, the oxygen is still in our lungs, so it is present. It hasn't decreased. But the level of CO2 has risen to the point that it's toxic. And so even though there's oxygen present, that we have a toxic level of CO2 that causes our brain to panic. So the answer is, as you understand it, even though you have an appropriate level of oxygen in your blood, if the CO2 level is too high, that interferes somehow with the use of the oxygen. Yes, and that is based on the testimony of the first medical expert, Dr. Smiley. Okay. Now, Dr. Smiley also did support a finding of disability in this case. So now we have two primary care providers, Ms. Rivera and Dr. Stevens, who are saying she's limited, and then multiple medical experts. There's also the rejection of her testimony. The administrative law judge felt that she was exaggerating her testimony and that she was drug-seeking. This question was posed to the medical experts, and the medical experts did not see evidence of drug-seeking. They said that emergency rooms keep track of this. They keep track of people who are looking for drugs, and there just was no evidence of that. Were there anecdotal remarks in the 2,500-page record about her wanting medication? Yes, she had back pain. She asked for it. She was anxious. There were times when doctors wondered, could she be a drug seeker? But there was no evidence, and when it was posed to the medical experts, they saw no evidence of exaggeration, specifically no evidence of malingering and no evidence of exaggeration. The proper remedy in this case would seem to be an award of benefits because of the length of time that this case has been pending and also because of the number of medical opinions that were rejected. We've got two questions. One is, was the order properly set aside? And the other one is the earlier onset date. What's the difference in recovery? Assume that you succeed in overturning the setting aside the award for the later amount. How much money are we talking about? Well, so the SSI amount depends on the individual, but I can't answer your question in terms of time. Her first SSI application was filed in August of 2017. Her alleged onset date doesn't matter because benefits are only payable as of the date of filing. So that would be August of 2017. She was found disabled on the second claim as of her 55th birthday, and that was in 2020, July of 2020. And so for her, it's a significant amount of time. I'm mindful of the – well, I think I'm at my two-minute point, so I'll address that later. Thank you. Good morning, Your Honors. May it please the Court, David Burdett representing the Commissioner Martin O'Malley in this matter. I would like to just first correct or perhaps add to some observations that were made about the medical evidence. It is far more equivocal for the period at issue than was presented. First of all, there is certainly evidence of drug-seeking at page 1139 of the record. In 2018, the care provider noted that Ms. Nevin came up very short on a pill count and, quote, has obviously been misusing her medications, close quote. And there were other instances of drug-seeking on the record. With regard to her interstitial lung disease – Do you have any quick ER sites for the other instances? Beg your pardon? You gave us an ER site for one instance. Do you have the ER sites for the others? Yes. At page 789, an instance in 2017. Okay. Just give me the pages. Beg your pardon? You can save time. Just give me the pages. 789? Yep. ER 2812 through 2815. And ER 2727. And my first one was 1139. What is the last one? 2727. Pages 789 – I'll do them in numerical order. Pages 789, 1139, 2812 to 15. 2812 to 15, okay. And 2727. 2727, okay. With regard to the interstitial lung disease, as my opposing counsel indicated, Ms. Nevin went up to see Dr. Bridget Collins at the University of Washington, who's the director of the Center for Interstitial Lung Disease there, and she did the walking test. Ms. Nevin had asserted on her function report that she could only walk 20 feet without oxygen before collapsing, and she later amended that. To be fair, she responded to a question at the hearing where it said 50 or 100 or 150 feet. She said, I cannot walk that far. In fact, Dr. Collins discovered that in a matter of six minutes, she could walk 1,417 feet, or the length of more than four football fields, while carrying on a conversation with Dr. Collins. And because of this, Dr. Collins said, I cannot find her disabled because of her lung disease at this time. So that is not at all evidence that supports a disability due to interstitial lung disease at any part of the period at issue. With regard to the evidence of the medical experts, the first medical expert back in the 2018 hearing Dr. Smiley was referred to, his testimony was equivocal. The ALJ at that time asked him on page 157 of the record, the objective evidence would point us to what? The answer was light. That is, light exertional limitation rather than sedentary, as she would prefer. At page 160 of the record, is there any objective evidence suggesting she would be unable to work four days a month? Dr. Smiley answers, no. With regard to the second medical expert at the 2021 hearing, that was Dr. Hopper. Dr. Hopper told the ALJ, and this is very important for the issue of reopening, Dr. Hopper told the ALJ that it was not proper for a physician who had not examined the patient, had never seen the patient, such as the DDS physician, Dr. Fitterer, in the intervening claim that led to the subsequent approval, that it was not proper, Dr. Hopper said, to diagnose a somatoform disorder having never seen the claimant. Well, so that suggested to the ALJ that the whole premise of the DDS physician's allowance in 2018 was not correct. So the medical expert testimony is very much more equivocal than was presented, and in fact supports that there's substantial evidence in support of the ALJ's claim throughout the period from August of 2017 all the way to July of 2020. Now, we don't quarrel. Did Dr. Hopper make that testimony exactly when in 2021? Beg your pardon? When exactly was Dr. Hopper's testimony in 2021? At the second hearing in? November. November of 2021. That's more than two years. At the hearing on the second. Right, that's more than two years past the initial notice of the grant of benefits. Yes, Your Honor, it was.  Now, with regard to the reopening that would take it back to September of 2018, not all the way back, in any case, not all the way back to August of 2017 as was her initial claim, but to September 2018, but with regard to the propriety of the reopening, that issue is ordinarily not judicially reviewable. It's discretionary. It's not a final decision, according to the statute, unless she makes out a culpable constitutional claim. Why is it not final? I mean, if we leave it alone, it's final, right? I mean, that's the answer. Well, I mean, in effect, it's final, but the rule is that it's not judicially reviewable. See, these reopening cases. Counselor, can I say what might trouble with your position? The Supreme Court case that you're relying on dealt with denials of motions to reopen. But then we have a whole lot of case law from a lot of circuits saying when there has been a reopening and then a subsequent final decision, that that causes both the final decision to be subject to review as well as the basis for that, which would be the decision to reopen. Essentially that there is a meaningful distinction between a denial of a motion to reopen and a reopening by an agency that leads to a new final decision. Can you address that, please? I understand that. I think I understand. I may or may not understand. But, no, I think I understand the distinction that you're making, Your Honor. But we think that regardless whether it arises in the context of a request to reopen or a denial to reopen, they have to make out a colorable constitutional claim. Why? Why is there no difference in your view? Because that, I admit that the Ninth Circuit cases have typically dealt with it arising in a different context. But we just think that the ordinary rule is that they have to make out a colorable constitutional claim for it to be a judicially reviewable matter. We don't think that they've made out. May I point out you still haven't really answered Judd's question? Well. You've just asserted what you think is the standard of review and what we can get at, but you've not answered her as to the relevance of that distinction. Well, I'm sorry, Your Honor. The distinction is between a request to reopen and a denial of reopen. Right. a reopening by the agency. And the question was, and then another essentially final decision, essentially reversing the prior decision that had been reopened. And the question was, does the court have jurisdiction to review? And the answer was, yes, we have jurisdiction to review because there is a new final decision, which is subject to judicial review. And because we have jurisdiction to review any final agency decision, like any other grant or denial of benefits, we also have jurisdiction to review the basis for that new final decision, which would include the agency decision to reopen, which is meaningfully distinguishable from an agency denial of a motion to reopen. So the courts in these other circuits have drawn that distinction. And my question is, why shouldn't we? I think it's wrong because a final decision merely contemplates the decision, the merits decision, and does not properly include the decision to reopen. Can you offer me some reasoning as to why? I can't other than the definition of the statute in 42 U.S.C. 405G. And I'm sorry that I'm not able to give you more than that. Assuming that the reopening is reviewable by us, why isn't the decision too late? Why isn't it outside the two years? Your Honor, assuming that it is reviewable, then I think the reopening honestly is outside the two years. Okay. Thank you. We would simply request that, on the basis of these facts, that the entire period, and certainly the beginning period from 2017 to 2018, be affirmed because substantial evidence supports CLJ's decision. Thank you. Thank you, Your Honor. I'd like to address two points made by opposing counsel, and one was regarding the evidence that he cited of drug-seeking behavior. Now, anybody can go through a long file and find remarks. What was noteworthy in this case is a medical expert, Dr. Hopper, was asked to do that. The administrative law judge made it very clear he encouraged her to look through the file for evidence of both exaggeration and drug-seeking behavior, and she didn't find it. And so for the administrative law judge to go back and to say that his own reading of the record showed drug-seeking behavior when he had specifically asked and gotten an answer from a medical expert that there was none, it was unreasonable in this case. What do you do with the walking in the doctor's office that seems to be inconsistent with her own testimony as to how far she could walk? Ms. Nevin is not the best judge of how far she can walk. What she knows is that she feels... Wait a minute. If I tell you I can walk X, I think I'm the best witness. True. And I think she's probably the best witness as to how far she can walk. But we now have her testimony, which seems to be inconsistent with what she did in the doctor's office. So what do we do with that? I guess my point, Your Honor, was that she said 20 feet at some points. She said she gave other distances. But the test in that case showed that she could do some walking on one occasion in a doctor's office. It doesn't say anything about stairs. It doesn't say anything about what kind of walking was involved. So even assuming that she could walk a bit further, that she could do the walking, the six minutes of walking, that doesn't show that she could perform light work. It's still well within sedentary work, which involves six hours of sitting, but up to two hours of standing and walking. So our contention is that that's perfectly compatible with what we're alleging and what the doctors found she could do in this case. Thank you.  Thank you for your arguments. This matter is submitted.
judges: FLETCHER, SUNG, Rakoff